321 F.3d 292
 Arthur MILLER, on behalf of himself and all others similarly situated, Plaintiff-Appellant,
v.
WOLPOFF & ABRAMSON, L.L.P., Upton, Cohen & Slamowitz, and National Attorney Network, Inc., successor to Wallace & de Mayo, a partnership and wholly-owned subsidiary of TSYS Total Debt Management, Inc., individually and as joint venturers and co-conspirators with each other, Defendants-Appellees.
 Docket No. 02-7017.
 United States Court of Appeals, Second Circuit.
 Argued: November 12, 2002.
 Decided: February 25, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Christopher V. Langone, Chicago, IL (Brian L. Bromberg, New York, NY, Lance Raphael, Chicago, IL, on the brief), for plaintiff-appellant.
 Thomas A. Leghorn, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, New York, N.Y. (Brett A. Scher, of counsel), for defendants-appellees Wolpoff & Abramson and Upton, Cohen & Slamowitz.
 Kevin G. McMorrow, Ahmuty, Demers & McManus, Albertson, N.Y. (Neil H. Angel, on the brief), for defendant-appellee National Attorney Network, Inc.
 Before: KEARSE, McLAUGHLIN, and SOTOMAYOR, Circuit Judges.
 SOTOMAYOR, Circuit Judge.
 
 
 1
 Plaintiff-appellant Arthur Miller appeals the grant of defendants' motions to dismiss and for partial summary judgment by the United States District Court for the Eastern District of New York (Reena Raggi, then-District Judge). Plaintiff claims that defendants-appellees, law firms Wolpoff & Abramson, L.L.P. ("W & A"), Upton, Cohen & Slamowitz ("UC & S"), and the National Attorney Network ("NAN"), a non-attorney referral network that coordinates the practice of debt collection, violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq., by sending debt collection letters on attorney letterhead without any meaningful attorney involvement in the decision to send those letters, by attempting to collect attorneys' fees that were to be shared with NAN, and by sending a debt collection letter that was misleading or deceptive.
 
 
 2
 For the reasons that follow, we hold that the grant of summary judgment on plaintiff's claim that W & A and UC & S failed to conduct a meaningful review of plaintiff's file before sending the debt collection letters on attorney letterhead was premature. We affirm the dismissal of plaintiff's claim that UC & S's efforts to collect attorneys' fees violates the FDCPA's prohibition on attempting to collect an amount not expressly authorized by the agreement creating the debt or by law. We hold that the underlying credit card agreement permitted the collection of attorneys' fees and that the fact that UC & S later may have intended to share those fees with a non-lawyer does not render the attempt to collect such fees illegal, even if that act of sharing might violate New York professional ethics rules. Finally, we hold that plaintiff's claim that language in W & A's original collection letter overshadows or contradicts the validation notice was properly dismissed because the notice clearly advises the consumer of her FDCPA rights and is neither overshadowed nor contradicted by the language on the front of the letter. Accordingly, we vacate in part, affirm in part, and remand.
 
 BACKGROUND
 I. Factual Background[1]
 
 3
 Plaintiff Arthur Miller entered into a credit card agreement with Lord & Taylor. After Miller refused to pay $1618.14 owed on the card, he received a series of letters from defendants W & A and UC & S in connection with their attempts to collect on the debt.
 
 
 4
 W & A regularly represents Lord & Taylor on collection matters, and Lord & Taylor sent the Miller file to W & A for collection assistance. On February 23, 2000, Ronald Abramson, a partner at W & A, reviewed the "file," which contained the following information: Miller's full name, social security number, current address, home and work phone numbers, the Lord & Taylor account number, the date the credit account was opened, the date of the last charge to the account, the date the account was charged off, the account balance, and "a synopsis of [Lord and Taylor's] recent customer service notes regarding their efforts to resolve Mr. Miller's account prior to forwarding the matter to [W & A] for collection." After reviewing this file, Abramson claims he "activated a print command on Wolpoff & Abramson's computer system and W & A's initial collection letter ... was printed and mailed to the Plaintiff on February 25, 2000."
 
 
 5
 The February 25, 2000 letter identified W & A as "Attorneys in the Practice of Debt Collection (A National Attorney Network Firm)." The letter demanded payment of "$1618.14 (including applicable contractual charges)," noted that it was sent with regard to May Department Stores/Lord & Taylor, and stated:
 
 
 6
 Please be advised that we represent the above-named creditor who claims you have a delinquent balance as stated above. After you have read the important notice on the reverse side of this letter, if appropriate please call our office to resolve this matter.
 
 
 7
 When paying the balance in full or if you are unable to call our office, check one of the options below and return the bottom portion of this letter in the self-addressed envelope provided for your convenience.
 
 
 8
 Very truly yours,
 
 
 9
 WOLPOFF & ABRAMSON, L.L.P.
 
 
 10
 At the bottom of the letter was a "detach and return" section listing four options with boxes for the consumer to check:
 
 
 11
 [] I mailed a check on __________ [] Here is payment in full made payable to the creditor. Thanks for waiting. (If paying by Western Union Quick Collect, for your convenience please see payment instructions on reverse side.)
 
 
 12
 [] Enclosed is payment in full made payable to the creditor, but it's post-dated a few days. (Not applicable for residents of Massachusetts.)
 
 
 13
 [] I cannot call you during the day. Please have someone call me. My telephone number during the day is _______ My telephone number in the evening is ________
 
 
 14
 * * * This is an attempt by a debt collector to collect a debt and any information obtained will be used for that purpose.* * *
 
 
 15
 * * * BEFORE RESPONDING TO THIS LETTER * * *
 
 SEE REVERSE SIDE FOR IMPORTANT NOTICE
 
 16
 On the back of the letter, in larger print than the text on the front of the letter, the following notice was printed:
 
 
 17
 * * * IMPORTANT NOTICE * * *
 
 
 18
 You are entitled to certain information that sets forth your rights and our obligations under the law. The law provides that: (a) Within five (5) days after the initial communication with a consumer in connection with the collection of any debt, we shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing (1) the amount of the debt, (2) the name of the creditor to whom the debt is owed, (3) unless a consumer, within thirty (30) days after receipt of this notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by this office, (4) if the consumer notifies this office in writing within the thirty day period that the debt, or any portion thereof, is disputed, this office will obtain verification and a copy of such verification will be mailed to the consumer by this office, and (5) upon the consumer's written request within the thirty day period, this office will provide the consumer with the name and address of the original creditor if different from the current creditor. (b) If the consumer notifies this office in writing within the thirty day period that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, we shall cease collection of the debt, or any disputed portion thereof, until this office obtains verification of the debt or the name and address of the original creditor, and a copy of such verification, or name and address of the original creditor, is mailed to the consumer by this office. (c) The failure of a consumer to dispute the validity of a debt under the section may not be construed by any court as an admission of liability by the consumer.
 
 
 19
 This is an attempt by a debt collector to collect a debt and any information obtained will be used for that purpose.
 
 
 20
 On April 26, 2000, Miller was sent a second letter, also on W & A letterhead, informing him that:
 
 
 21
 All attempts to contact you concerning the above account have proven to be unsuccessful. It is important that you call us at 301-961-7620, or toll free at 1-800-678-7720 to discuss this matter. We are pleased to inform you that if you call our office within ten (10) days from the date of this letter, YOU MAY QUALIFY FOR A LARGE DISCOUNT ON THE ABOVE MATTER. This is a limited time offer only; you must contact our office within this ten (10) day period.
 
 
 22
 The letter included a "payment coupon" portion to detach and return with payment.
 
 
 23
 On May 31, 2000, W & A sent a third letter advising Miller that "[o]ur client has authorized this office to make an extraordinary offer to settle your past-due account with them. We have been permitted to accept $1294.51, which represents 80% of the outstanding balance as settlement in full of your obligation." The letter informed Miller that he had until June 28, 2000 to make a lump sum payment in full, and advised him that if he could not make the entire payment by that date, "please call our office and we will be happy to make reasonable payment arrangements with you on the balance." The letter also instructed that any check or money order should be made payable to the client but sent to W & A's office with the enclosed payment coupon.
 
 
 24
 Plaintiff did not respond to any of these letters, and on July 12, 2000, plaintiff's file was referred through NAN to UC & S with instructions to initiate litigation promptly. On July 18, 2000, UC & S sent plaintiff a letter demanding payment of $1676.69, and stating in pertinent part: "Please be advised that we are the attorneys for the above creditor. The above referenced account has been forwarded to us for collection. Please contact this office to arrange for payment." This letter, unlike the first three W & A letters, was hand-signed by Mitchell G. Slamowitz, Esq. On August 25, 2000, Attorney Slamowitz filed a verified complaint in Queens County court seeking recovery of $1618.14 and attorneys' fees of $323.63 for Miller's alleged breach of the credit card agreement with Lord & Taylor. Slamowitz claims that he determined that the underlying credit card agreement authorized payment of attorneys' fees before he filed the complaint.
 
 
 25
 According to plaintiff, under the agreement between NAN and UC & S, NAN would have been entitled to 3% of any amount ultimately collected by Lord & Taylor as a result of the litigation.[2]
 
 II. Proceedings Below
 
 26
 On February 23, 2001, Miller filed suit against W & A, UC & S and NAN, alleging that defendants, individually and as joint-venturers and co-conspirators, violated the FDCPA (1) by sending debt collection letters on attorney letterhead without meaningful review by any attorney of the circumstances surrounding plaintiff's alleged debt, (2) by attempting to collect attorneys' fees that were to be shared with NAN as a referral fee in violation of state professional ethics rules, and (3) by mailing a letter that would confuse the "least sophisticated consumer" as to his or her rights. Plaintiff brought these claims as a putative class action.
 
 
 27
 Three months later, before any discovery was conducted, defendants moved to dismiss or alternatively for summary judgment. The motions relied in part on affidavits submitted by Ronald Abramson, Jay Scheiner, Laurence C. Abramson, Ronald S. Canter, and Mitchell Slamowitz, attorneys at W & A and UC & S involved with sending the debt collection letters and initiating the state court proceeding against Miller. Plaintiff filed a responsive letter motion on June 20, 2001, seeking denial of the motions without prejudice under Fed. R.Civ.P. 56(f), or alternatively, either an expedited discovery schedule or modification of the briefing schedule to permit him time to conduct discovery, including deposing the attorney affiants, before responding to the motions. The letter explained that notwithstanding defendants' reliance on affidavits supporting the motions for summary judgment, "[d]efendants are resisting our efforts to obtain depositions from those affiants that they are using in their motion papers." On July 3, 2001, the district court denied plaintiff's motion and advised that "[t]o the extent the plaintiff wishes to seek relief under Rule 56(f), he should do so in his formal opposition to the pending motions, in a manner compliant with the Rule's requirements." The district court did not address the alternate relief sought by plaintiff. Consistent with this order, plaintiff submitted a Rule 56(f) affidavit from his counsel in opposition to summary judgment detailing the areas where discovery was sought and explaining that defendants had resisted discovery and, as a result, that no discovery had been taken to date.
 
 
 28
 Following oral argument on November 9, 2001, the district court granted from the bench defendants' motions to dismiss or alternatively for summary judgment. First, the district court held as a matter of law that the attorney defendants had conducted a sufficiently meaningful review before sending the collection letters. Specifically, the court found, based on the affidavits submitted by the attorney defendants in support of the motions, that "these individuals did more than just peruse a debt notice. Each of them has stated under oath that they reviewed the file and confirmed that the debt was then outstanding — this would be the most important thing to ensure that there was not stale information — to ensure that the correct person's account was at issue." Based on this representation, the district court held that "the lawyer has done what would be expected of a licensed professional under the circumstances ...." Denying plaintiff's request under Rule 56(f) for additional discovery, the court held:
 
 
 29
 "Nothing I've heard today suggests that there would be any benefit in having the attorneys deposed. The parties' dispute is over whether they needed to do more before they could use their letterhead under the law, and I'm satisfied from the cases cited by the defendants in their briefs that these lawyers did what was expected of them under the law for them to use their letterhead to send out the notices."
 
 
 30
 Next, assuming for purposes of the motions that NAN would have received its fee from UC & S's fee recovery, rather than from Lord & Taylor's total recovery, the district court found that there was a "serious question" whether plaintiff had standing because "we know that the consumer did not pay the debt under these circumstances." The court went on to consider whether the practices alleged here could be found to have violated the FDCPA, in that "the collection of this amount [the $323.63 sought by UC & S in the state court suit] was either not expressly authorized by the agreement or not permitted by law." Noting that the agreement between Miller and Lord & Taylor expressly provides that if a debt had to be collected through litigation, the consumer might be liable for the debt and reasonable attorneys' fees, the court found that UC & S's 20% contingency fee amounted to only $322.80, a reasonable fee as a matter of law, and the court concluded that sharing $40 of this fee with NAN was not contrary to the agreement. The district court also rejected plaintiff's argument that the payment of fees to NAN was an improper referral fee, stating that "[i]f there is any problem in this referral argument, it is properly addressed not by a jury awarding statutory fees or attorney's fees in a federal action for fair debt collection practice, but by the disciplinary committee of the New York State Supreme Court of Appeals."
 
 
 31
 Finally, the district court rejected plaintiff's argument that the first dunning letter sent by W & A was impermissibly confusing because the statement that the debtor could call the sender with questions "overshadowed" the notice on the back of the letter advising the debtor that any dispute to the debt must be in writing. The court held:
 
 
 32
 It seems to me beyond dispute resolvable as a matter of law that the actual validation notice is complete in its advice to a consumer, even the least sophisticated consumer, that to dispute the debt, actions have to be taken in writing and they will in turn trigger other actions by the debt collector .... The suggestion made to this court is that because the attorney also suggested in the cover letter that the recipient of the letter could call the law firm, in other words, actually deal with a human being, that somehow this violated federal law. This is a tortured reading of the letter that could not be found by any reasonable fact finder. The letter's reference plainly makes clear to the recipient that it is the attached validation notice that is the important document and that the call can be made, if necessary. One would understand this to mean if there are further questions, if you need any explanations, but not that the notice about the writing can be ignored.
 
 
 33
 Miller timely appealed both the July 3, 2001 Order denying his request for discovery and the November 9, 2001 Order granting the motions to dismiss or alternatively for summary judgment.
 
 DISCUSSION
 I. Standard of Review
 
 34
 Our standard of review for both motions to dismiss and motions for summary judgment is de novo. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.2002) (motion to dismiss); Mario v. P & C Food Markets, Inc., 313 F.3d 758, 763 (2d Cir.2002) (summary judgment). On a motion to dismiss or for judgment on the pleadings we "must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir.2001). A case should not be dismissed unless the court is satisfied that the complaint cannot state any set of facts that would entitle the plaintiff to relief. Id. On a motion for summary judgment, all factual inferences must be drawn in favor of the non-moving party. Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 343 (2d Cir.1999). Summary judgment is appropriate only if the moving party shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Id. Finally, we review the denial of leave for discovery under Fed.R.Civ.P. 56(f) for abuse of discretion. Belfiore v. N.Y. Times Co., 826 F.2d 177, 183 (2d Cir.1987).
 
 
 35
 II. The False Representation that a Debt Collection Letter is "From an Attorney"
 
 
 36
 The FDCPA creates a general prohibition against the use of "false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Section 1692e contains a non-exhaustive list of practices within the purview of this prohibition, including "[t]he false representation or implication that any individual is an attorney or that any communication is from an attorney." Id. § 1692e(3). Although there is no dispute that W & A and UC & S are law firms, or that the letters sent by those firms were "from" attorneys in the literal sense of that word, some degree of attorney involvement is required before a letter will be considered "from an attorney" within the meaning of the FDCPA. See, e.g., Clomon v. Jackson, 988 F.2d 1314, 1321 (2d Cir.1993) ("[T]he use of an attorney's signature on a collection letter implies that the letter is `from' the attorney who signed it; it implies, in other words, that the attorney directly controlled or supervised the process through which the letter was sent .... [T]he use of an attorney's signature implies—at least in the absence of language to the contrary—that the attorney signing the letter formed an opinion about how to manage the case of the debtor to whom the letter was sent.").
 
 
 37
 Here, plaintiff claims that the letters sent by W & A and UC & S were form letters generated by a computerized debt collection system without any meaningful attorney involvement in the process. Plaintiff also argues that the district court abused its discretion by refusing to allow him to conduct any discovery to enable him to respond to the motions for summary judgment while simultaneously relying on defendants' affidavits to conclude that a meaningful review of the file was conducted by W & A and UC & S. For the reasons that follow, we conclude that the grant of summary judgment on this record was premature.
 
 
 38
 Defendants moved for summary judgment on May 25, 2001. Plaintiff's counsel informed the district court by letter dated June 20, 2001, that he had attempted to depose the witnesses on whose affidavits defendants' motions were based and that defendants were "resisting our efforts to obtain [those] depositions." In response, defendants' counsel informed the district court only that it had provided similar affidavits to counsel before the lawsuit was filed and that plaintiff's counsel was aware that defendants intended to move for early dismissal of the claims. Defendants do not dispute that plaintiff had no opportunity to depose the lawyers whose affidavits provided the basis for the district court's decision. In response to plaintiff's June 20, 2001 request for additional time to conduct discovery, the district court "denie[d] plaintiff's requests and order[ed] the parties to adhere to the previously approved briefing schedule," noting that if plaintiff wished to file a Rule 56(f) affidavit, he could do so in his formal opposition to summary judgment.
 
 
 39
 Heeding the district court's advice, plaintiff's counsel filed an affidavit detailing the discovery that was sought and the unsuccessful attempts that had been made to obtain that information. In particular, the Rule 56(f) affidavit explained that plaintiff sought four categories of discovery:
 
 
 40
 A) Written and oral discovery to determine and confirm the nature and extent of the relationship between Defendants.... This information is necessary and relevant to the issue of joint venture.
 
 
 41
 B) Written and oral discovery to determine the nature of the fee-splitting arrangement between Defendants and NAN ....
 
 
 42
 C) Written and oral discovery to determine the extent of review made by Defendants of Plaintiff's file prior to sending collection letters and initiating litigation, including any written materials related to review policies and depositions of Mr. Slamowitz, Mr. Roland M. Abramson, and Mr. Scheiner. This information is necessary and relevant to the issue of whether Defendants' review of Plaintiff's file was meaningful.
 
 
 43
 D) Written and oral discovery to determine the author and/or source of the debt-collection [letters] sent to consumers by NAN member law firms .... This information is necessary and relevant to the issue of whether Defendants misrepresent who is sending the debt-collection letters (an attorney or a non-attorney sending letters on attorney letterhead).
 
 
 44
 (Emphasis added). The affidavit further explained that plaintiff had attempted to obtain the information through public information sources, but that the specific information sought appeared to be within defendants' sole possession and knowledge. Plaintiff's counsel also stated that plaintiff had been "unable to obtain the specific information listed above because Defendants have refused to cooperate."
 
 
 45
 Defendants argue that the district court properly denied the request for discovery. First, they contend that because the initial letter did not comply with Rule 56(f), the district court properly denied it. While the letter did not comply with the Rule, it did promptly request an extension of the briefing schedule to permit time to conduct discovery, and, contrary to defendants' assertion, noted with specificity that plaintiff sought, inter alia, to depose the three affiants. We have previously observed that "when alerted to a forthcoming motion for summary judgment, a party wanting more time for discovery should seek, through negotiation with the other party and, if necessary, through application to the district court, an appropriate discovery schedule." Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 927-28 (2d Cir.1985). While plaintiff here did not move for a discovery schedule until after the summary judgment motion was filed, it appears from the record that he did so within a month of receiving defendants' motions, which were filed only three months after the complaint was filed. Thus, we do not fault plaintiff for requesting expedited discovery or a modified briefing schedule when alerted to the basis for defendants' motions for summary judgment.
 
 
 46
 Defendants also argue that plaintiff has waived appeal of the discovery issue by failing to "challenge[] any action taken by the lower court pursuant to his Rule 56(f) affidavit in his notice of appeal ...." W & A/UC & S Br. at 29. Plaintiff appealed both the July 3, 2001 Order denying the letter request for time to conduct discovery and the summary judgment ruling, which granted defendants' motions to dismiss or for summary judgment over plaintiff's objection that he needed additional time to conduct discovery to respond to the motions. The test for determining the sufficiency of a notice of appeal is "whether it is objectively clear that a party intended to appeal." Fed. R.App. P. 3(c) advisory committee note (1993 Amendments). Thus, as it is clear from the face of the notice of appeal that plaintiff challenged both the denial of additional time to conduct discovery and the grant of defendants' motions to dismiss or alternatively for summary judgment, he cannot be said to have waived this issue on appeal.
 
 
 47
 Finally, defendants contend that the affidavit focused primarily on the relationship between NAN and the two law firms, and that "[t]he only portion of counsel's affidavit relating to the meaningful involvement issue asked for discovery as to `the extent of review made by (the attorneys) of Plaintiff's file prior to sending collection letters and initiating litigation.'" W & A/UC & S Br. at 30. Defendants maintain that the affidavit was insufficient because it "did not explain how the facts sought to be discovered would create a genuine issue of material fact, particularly where attorney affidavits explaining the nature of both firms' review of Miller's account were already in the record." Id. We disagree.
 
 
 48
 "[A] party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing `(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.'" Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir.1999) (quoting Meloff v. N.Y. Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995)) (alteration in original). Here, the affidavit sought discovery in four discrete categories, the last two of which were directly related to the "meaningful involvement" claim at issue here. The affidavit explained that plaintiff required information about the extent of defendants' review of the file. As this was the critical issue in plaintiff's claim that sending the letter on attorney letterhead violated the FDCPA, these missing facts reasonably could have created a genuine issue of material fact to defeat summary judgment. Moreover, defendants' contention that the affidavit was silent as to the steps taken to obtain additional information without discovery ignores the fact that the affidavit stated that the information sought was within defendants' possession and that defendants had resisted discovery. Inasmuch as plaintiff clearly explained that he sought to depose the three affiants, this satisfies the third and fourth requirements of Rule 56(f). Thus, the affidavit substantially complied with the requirements of Rule 56(f).
 
 
 49
 While the affidavit did not specify with precision the information plaintiff believed he could learn from deposing the three affiants, plaintiff cannot be faulted for failing to advise the district court precisely what information he might learn during discovery given that the facts sought were exclusively within defendants' possession and that he had no previous opportunity to develop the record through discovery. See Meloff, 51 F.3d at 374 (reversing grant of summary judgment in an employment discrimination case where plaintiff had insufficient opportunity "to explore the motivations and reasons for terminating her employment"); cf. Fitzgerald v. Henderson, 251 F.3d 345, 362 (2d Cir. 2001) (observing that where the district court denied the plaintiff any opportunity to conduct discovery and considered a partial summary judgment motion filed two months after the filing of the complaint, "[f]aulting [plaintiff] for failure to make a showing of ... matters that would ... be beyond her personal knowledge [] was incompatible with the court's denial of discovery").
 
 
 50
 "Fed.R.Civ.P. 56(f) provides, as interpreted by court opinions, that when a party facing an adversary's motion for summary judgment reasonably advises the court that it needs discovery to be able to present facts needed to defend the motion, the court should defer decision of the motion until the party has had the opportunity to take discovery and rebut the motion." Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc., 271 F.3d 374, 386 (2d Cir.2001). Accordingly, we have held that summary judgment should only be granted if "after discovery, the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Hellstrom v. United States Dep't of Veterans Affairs, 201 F.3d 94, 97 (2d Cir.2000) (internal quotation marks omitted) (alterations in original). "Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." Id.; accord Trebor Sportswear Co. v. The Ltd. Stores, Inc., 865 F.2d 506, 511 (2d Cir.1989) ("Under Rule 56(f), summary judgment may be inappropriate where the party opposing it shows ... that he cannot at the time present facts essential to justify his opposition. The nonmoving party should not be `railroaded' into his offer of proof in opposition to summary judgment. The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment." (internal quotations and citations omitted)).
 
 
 51
 The district court concluded that no discovery was necessary in this case because "[t]he parties' dispute is over whether they needed to do more before they could use their letterhead under the law, and I'm satisfied from the cases cited by the defendants in their briefs that these lawyers did what was expected of them under the law for them to use their letterhead to send out the notices." The district court held that the fact that Mr. Abramson had "checked that his client, Lord & Taylor's, last records showed that [the] debt was still outstanding" satisfied defendants' obligations. Given the very limited nature of the material Mr. Abramson claimed to have reviewed, however, the district court's conclusion could only be based on the fact that Lord & Taylor had reported the debt for collection to W & A with an outstanding balance and Lord & Taylor's "synopsis" of its "recent" customer service notes indicated that plaintiff had offered a reduced payment, which had been refused.[3]
 
 
 52
 While plaintiff asks us to declare a minimum standard requiring attorneys to review a copy of the contract, a credit report, and a full payment history or statement of account to satisfy Clomon's requirement of meaningful attorney involvement, we decline to do so on the record here, in part because there may be circumstances where, following discovery, it becomes clear that the attorney's familiarity with the client's contracts and practices would negate the need to review some if not all of the documents plaintiff seeks to require. For example, an attorney and client could have established a practice whereby the attorney has specified that the entire payment history is to be included in the summary provided by a client. On this undeveloped record, however, it suffices for us to hold that merely being told by a client that a debt is overdue is not enough. See Nielsen v. Dickerson, 307 F.3d 623, 638 (7th Cir.2002) (holding that the FDCPA was violated where the attorney "knew nothing about the debtor and her potential liability beyond what [the client] had conveyed to him; and [the client] provided [the attorney] only the bare information that [he] required in order to complete the blanks in his form letter").
 
 
 53
 Defendants argue that their affidavits make clear that they satisfied the FDCPA's requirement of meaningful attorney involvement. These affidavits, however, lack sufficient detail to permit the district court or us to determine that their review was sufficient as a matter of law. For example, Mr. Abramson stated that:
 
 
 54
 I was the partner who personally reviewed our client's file on [Miller] after it's [sic] referral to W & A. No collection activity can take place until a partner reviews our client's file and exercises his or her independent professional judgment that collection is appropriate. At that time, the partner must personally execute the print command of the letter which will be sent to the debtor.
 
 
 55
 This conclusory language does not describe what information Abramson reviewed to permit him to exercise his "independent professional judgment." We must assume for purposes of this motion for summary judgment, however, that it was no more than the very limited information described in his initial affidavit. Thus, while Abramson claimed that W & A attorneys reject or suspend debt-collection referrals "for a multitude of reasons including the matter falling outside of the applicable statute of limitations, the debtor filed bankruptcy making the obligation unenforceable, and the information in the client record is inconsistent or incomplete," and asserted that "[a]fter my personal review of Mr. Miller's file, I determined that collection was, in fact, appropriate and that none of the aforesaid reasons for suspension or rejection of the referral was appropriate," the information Abramson initially claimed that he reviewed would not enable him to determine whether Miller was in bankruptcy, whether the information in the record was inconsistent or incomplete, whether Miller was or was not obligated to pay the debt, or whether Miller was the correct debtor. Similarly, Abramson's assertion that "attorneys at W & A regularly reject client referrals after a review of the client file indicates the debtor is not obligated to pay the account, the alleged debtor is not the correct debtor as well as a determination from an attorney at W & A that additional information is necessary to support the claim," does not entitle W & A to summary judgment on this record because we cannot conclude that the information in plaintiff's file was adequate to make these kind of judgments.
 
 
 56
 In addition, the affidavit submitted by UC & S partner Mitchell Slamowitz describing the steps taken by UC & S before its July 18, 2000 letter was sent merely stated that he reviewed the file sent by W & A through NAN software, which included "Mr. Miller's full name, social security number, current address, telephone number, the Lord & Taylor account number, the amount of the debt, and a notation that Mr. Miller was an attorney.... After reviewing the file, I made the decision to send a letter to Mr. Miller and I personally signed the letter, dated July 18, 2000." This too is insufficient to support the conclusion as a matter of law that any professional judgment was exercised before UC & S sent its collection letter.[4] Cf. Boyd v. Wexler, 275 F.3d 642, 646 (7th Cir.2001) ("Before a follow up letter can be responsibly approved by a lawyer, he must inspect the file to determine that there has been no partial payment or other response from the debtor ...."). Similarly, while Slamowitz stated that "[a]t the time of this initial review of Mr. Miller's file, I also determined that a summons and complaint should be filed if Mr. Miller did not respond to the letter dated July 18, 2000," the affidavit does not demonstrate any basis for this determination.
 
 
 57
 Finally, we also note that plaintiff claims that W & A takes in over 55,000 new collection accounts monthly via electronic transmission.[5] If plaintiff's account is typical, this suggests that W & A could have mailed over 110,000 letters a month. While defendants argue that this fact is not in the record and that plaintiff's emphasis on electronic transmission is "factually and legally irrelevant," if discovery in this case were to reveal that W & A and UC & S handled this high volume of accounts, received only the limited information described in the attorney affidavits, reviewed the collection files with such speed that no independent judgment could be found to have been exercised, and then issued form collection letters with the push of a button, a reasonable jury could conclude that W & A and UC & S lacked sufficient professional involvement with plaintiff's file that the letters could be said to be from an attorney. See, e.g., Nielsen, 307 F.3d at 637 ("[T]he numbers (recall that [the client] referred [the attorney] an average of some 2,000 accounts per month) and assembly-line fashion in which [the attorney's] letter was issued betray the purely nominal nature of his participation in the collection process."); Boyd, 275 F.3d at 648 (holding that the high volume of mail handled by a debt-collecting attorney was relevant to his credibility where the attorney claimed in an affidavit to have reviewed plaintiff's file before sending letter, because the volume of mail suggested both that the attorney might not have had time to review the file and that he might not remember accurately).
 
 
 58
 If, on the other hand, it becomes clear after discovery that W & A and UC & S do indeed review information reasonably calculated to permit them to make the kind of determinations Abramson claims to have made before sending the collection letters, the letters would be in compliance with the FDCPA. See, e.g., Nielsen, 307 F.3d at 638 ("[A]n attorney must have some professional involvement with the debtor's file if a delinquency letter sent under his name is not to be considered false or misleading in violation of section 1692c(3) and (10)."); Boyd, 275 F.3d at 648 (requiring some showing of "professional judgment concerning the existence of a valid debt" before an attorney may send a collection letter); Clomon, 988 F.2d at 1321 ("[T]he use of an attorney's signature implies—at least in the absence of language to the contrary — that the attorney signing the letter formed an opinion about how to manage the case of the debtor to whom the letter was sent.").
 
 
 59
 In sum, by relying on the attorneys' affidavits and not allowing plaintiff any opportunity to investigate precisely what information the affiants reviewed, how much time was spent reviewing plaintiff's file, and whether any legal judgment was involved with the decision to send the letters and ultimately to initiate litigation— facts not clearly addressed in defendants' conclusory affidavits but highly relevant to the affiants' credibility and to whether the letters complied with the FDCPA — the grant of summary judgment on this claim was premature.
 
 
 60
 III. UC & S's Attempt to Collect Attorneys' Fees
 
 
 61
 Plaintiff also argues that because the FDCPA makes it illegal to attempt to collect an amount not "expressly authorized by the agreement creating the debt or permitted by law," 15 U.S.C. § 1692f(1), the filing of the state court complaint by UC & S seeking $323.63 in attorneys' fees violates the FDCPA. While plaintiff does not dispute that the credit card agreement here provided for payment of attorneys' fees, he contends that Ohio law prohibits collection of attorneys' fees in any consumer contract of adhesion and that the contingent 20% fee sought by UC & S was to be shared with NAN, in violation of New York's professional ethics rules. Thus, plaintiff's argument goes, the fees UC & S sought to collect cannot be said to be authorized by the agreement or by law.
 
 
 62
 As an initial matter, we conclude that plaintiff has waived the argument that the collection of attorneys' fees is barred by Ohio law. Miller did not allege in the complaint that attempting to collect attorneys' fees under a contract of adhesion violates Ohio law, nor did he raise this issue in opposition to the motion to dismiss or at oral argument. Significantly, plaintiff also never sought to amend the complaint to assert this claim. Accordingly, he cannot now rely on it as a basis for his FDCPA claim. See Caiola v. Citibank, N.A., 295 F.3d 312, 327 (2d Cir.2002) ("[W]e generally do not consider arguments not raised below..").
 
 
 63
 Defendants maintain that plaintiff lacks standing to pursue this claim because it is undisputed that plaintiff never paid any attorneys' fees to either UC & S or NAN, as the underlying lawsuit initiated by UC & S was settled with different counsel. Accordingly, defendants argue that plaintiff did not suffer any identifiable injury. The FDCPA provides for liability for attempting to collect an unlawful debt, however, and permits the recovery of statutory damages up to $1,000 in the absence of actual damages. Thus, courts have held that actual damages are not required for standing under the FDCPA. See, e.g., Keele v. Wexler, 149 F.3d 589, 594 (7th Cir.1998) ("[T]he plaintiff who admittedly owes a legitimate debt has standing to sue if the Act is violated by an unprincipled debt collector."); Baker v. G.C. Servs. Corp., 677 F.2d 775, 777 (9th Cir.1982) (same); cf. Gambardella v. G. Fox & Co., 716 F.2d 104, 108 n. 4 (2d Cir.1983) (noting that "[i]t is well settled ... that proof of actual deception or damages is unnecessary to a recovery of statutory damages" under the Truth in Lending Act). Accordingly, we join those courts and hold that the fact that plaintiff did not ever pay any attorneys' fees to NAN does not necessarily suggest that he was not injured for purposes of his FDCPA claim, if he can show that UC & S attempted to collect money in violation of the FDCPA.
 
 
 64
 We therefore turn to the dispositive question before us: whether the fees sought to be collected were not permitted by the contract or by law. Miller argues that the $323.63 sought by UC & S in the verified complaint was not an amount permitted by law because UC & S intended to share some portion of the fee with NAN in violation of state ethics rules. We find no support for plaintiff's position that an attorney violates the FDCPA by attempting to collect a facially reasonable fee—consistent with the terms of the underlying agreement—with the intent later to use the money in some otherwise prohibited manner.[6]
 
 
 65
 Miller also argues even if a violation of state professional ethics rules does not give rise to a private right of action, it is evidence that defendants violated the FDCPA, noting that "many of the express prohibitions of the FDCPA involve conduct that would also be a violation of a lawyer's ethical standards." Appellant's Br. at 30. Even if this is true, however, plaintiff's cause of action under § 1692f(1) requires a showing that defendants attempted to collect an amount not expressly permitted either by the agreement creating the debt or by law. In other words, plaintiff states a claim only if the $323.63 sought by UC & S in the state court complaint was not permitted by the Lord & Taylor agreement or by law. Thus, the cases cited by plaintiff where courts have considered certain conduct that violates professional ethics rules as also deceptive or misleading in violation of the FDCPA's prohibition of the use of "false, deceptive or misleading representation[s]," 15 U.S.C. § 1692e, or as violative of other FDCPA provisions, are inapposite. See Appellant's Br. at 31; Appellant's Reply Br. at 12-13.
 
 
 66
 In summary, plaintiff challenges not the reasonableness of the fee itself but rather what UC & S later intended to do with its fee. The district court correctly found that plaintiff failed to state a claim in that the amount UC & S sought to collect was permitted by the agreement and was not prohibited by law.[7]
 
 IV. The W & A Collection Letter
 
 67
 Finally, Miller argues that the district court erroneously granted defendants' motion to dismiss his claim that the February 25, 2000 collection letter sent by W & A violates § 1692g because it would confuse the least sophisticated customer as to his or her rights under the FDCPA. On appeal, Miller raises three objections to the letter: (1) the failure of the checklist on the front of the letter to include an option to request validation of the debt could confuse a consumer, notwithstanding the notice on the reverse of the letter advising that requests for debt-validation must be in writing; (2) the validation notice itself is deceptive because it suggests that the listed information is an exclusive listing of a consumer's rights under the FDCPA; and (3) the listing of forty-four cities as "NAN affiliates" on the letterhead is misleading because it could suggest to a consumer that W & A was admitted to practice law in all of those jurisdictions.
 
 
 68
 Defendants again raise a preliminary issue of waiver. Plaintiff's complaint alleges that the letter was misleading because it identified only certain FDCPA rights (Complaint, at ¶ 77), and instructed the consumer to call W & A to resolve the matter (Complaint, at ¶¶ 88-92). In opposition to the motion to dismiss, plaintiff argued only that the letter violated the FDCPA because "a reasonable reading of the notice on [the] initial debt collection letter is that consumers have only the rights specified in the letter and not others." Pl. Opp. to Mot. to Dismiss, at 19-21. Finally, when asked by the district court at oral argument to articulate how the letter violated the FDCPA, plaintiff explained:
 
 
 69
 The validation notice says, after reading the notice, call if appropriate. A call is not sufficient to preserve your rights under the FDCPA .... As a matter of fact, the only thing that the notice encourages [consumers] to do in writing is to check those various boxes .... None of these boxes assume that I contest this debt.
 
 
 70
 Accordingly, because plaintiff was given numerous opportunities to clarify the claims at issue, and failed to raise the claim that listing the forty-four NAN affiliated firms was deceptive or misleading at any time before this appeal, we find this argument to be waived. See Caiola, 295 F.3d at 327.
 
 
 71
 As previously noted, 15 U.S.C. § 1692e bars the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." In addition, 15 U.S.C. § 1692g requires debt collectors to include a "validation notice" either in the initial communication with a consumer in connection with the collection of a debt or within five days of that initial communication, which must inform the consumer that he or she has certain rights, including the rights to make a written request for verification of the debt and to dispute the validity of debt. See 15 U.S.C. § 1692g(a).
 
 
 72
 "When determining whether § 1692g has been violated, an objective standard, measured by how the `least sophisticated consumer' would interpret the notice received from the debt collector, is applied." Russell v. Equifax A.R.S., 74 F.3d 30, 34 (2d Cir.1996) (citing Clomon, 988 F.2d at 1318 (holding that the least sophisticated consumer standard applies to whether § 1692e has been violated)). "When a notice contains language that `overshadows or contradicts' other language informing a consumer of her rights, it violates the Act." Id. (citing Graziano v. Harrison, 950 F.2d 107, 111 (3d Cir.1991)). "A debt collection notice is overshadowing or contradictory if it fails to convey the validation information clearly and effectively and thereby makes the least sophisticated consumer uncertain as to her rights." Savino v. Computer Credit, Inc., 164 F.3d 81, 85 (2d Cir.1998).
 
 
 73
 In Russell, as in the instant case, the back of the notice included a validation notice that complied with the FDCPA. The front of the Russell letter, however, instructed the debtor, in all capital letters, that "If you do not dispute this claim (see reverse side) and wish to pay it within the next 10 days we will not post this collection to your file.... It is our practice to post unpaid collections in the amount of $25 or more to individual credit records." Russell, 74 F.3d at 34. We found that this notice was contradictory because the least sophisticated consumer "could readily believe — despite the inclusion of the validation notice—that were she to take any course other than payment to Equifax within 10 days, it would permanently affect her credit record." Id. Similarly, in Savino, we held that a debt collection letter stating that "[t]he [creditor] insists on immediate payment or a valid reason for your failure to make payment" was contradictory, despite the inclusion of the validation notice on the back of the letter, because the least sophisticated consumer could be confused by the "decision to ask for immediate payment without also explaining that its demand did not override the consumer's rights under [§ 1692g] to seek validation of the debt." 164 F.3d at 85, 86.
 
 
 74
 The W & A letter clearly advises the reader, in the main body of the letter, "[a]fter reading the important notice on the reverse" to "call our office to resolve this matter" "if appropriate." (emphasis added). The notice on the back, in turn, correctly instructs consumers that they should notify W & A in writing to request verification of the debt or to dispute the debt, while the front of the letter instructs the recipient that "[w]hen paying the balance in full or if you are unable to call our office, check one of the options below and return the bottom portion of this letter...." While the options detailed on the bottom of the letter do not include requesting validation of the debt, the bottom of the letter states in large-print, capital letters, "BEFORE RESPONDING TO THIS LETTER SEE REVERSE SIDE FOR IMPORTANT NOTICE." Thus, the reader is directed to the correct validation notice in several places, and is thereby advised of his or her FDCPA rights. See McStay v. I.C. Sys., Inc., 308 F.3d 188, 191 (2d Cir.2002) ("[W]hen a prominent instruction in the body of the letter warns that there is important information on the reverse side, a reasonable reader, even if unsophisticated, would turn the paper over and read the back.").
 
 
 75
 With these repeated instructions to review the validation notice on the back of the letter before responding to the letter, even the least sophisticated consumer would realize that it is "appropriate" to contact W & A's office by phone only if the consumer did not wish to exercise his or her FDCPA rights as outlined on the reverse of the letter. Where a validation notice plainly specifies that FDCPA contact must be in writing, and nothing on the front of the letter suggests in any way that an instruction to call was intended to override the requirements outlined in the validation notice, we do not believe that a reasonable consumer — having twice been instructed to review the validation notice before taking any further action—who wished to exercise his or her FDCPA validation rights could be misled into thinking that the clear obligation to request validation in writing was somehow modified by either the invitation to call if appropriate or the four options on the bottom of the letter. As this Court noted in Clomon, "courts have consistently applied the least-sophisticated-consumer standard in a manner that protects debt collectors against liability for unreasonable misinterpretations of collection notices." 988 F.2d at 1319. We therefore agree with the district court's conclusion that the letter was not misleading or deceptive on these grounds.
 
 
 76
 Finally, plaintiff argues that the letter is deceptive because the validation notice, which states that the recipient "is entitled to certain information that sets forth your rights and obligations under the law," and then describes what "[t]he law provides," incorrectly suggests to the least sophisticated consumer that the listed information is an exclusive list of a consumer's FDCPA rights. Plaintiff does not, however, dispute that the notice includes everything that the law requires be included in the validation notice. Because a consumer has no right to written notice about his or her other FDCPA rights, we do not find this language misleading or deceptive. See Savino, 164 F.3d at 86 (holding that the language at issue in that case was insufficient under the FDCPA, and proposing as an acceptable alternative the following notice: "Although we have requested that you make immediate payment or provide a valid reason for nonpayment, you still have the right to make a written request ... for more information about the debt. Your rights are described on the reverse side of this notice.") (emphasis added). Further, by advising that the FDCPA entitles a debtor to "certain information," the letter itself addresses plaintiff's concern, and cannot reasonably be read as suggesting that the rights described in the notice are an exclusive listing.
 
 
 77
 Accordingly, the initial collection letter sent by W & A was not false, deceptive or misleading as a matter of law, and the motions to dismiss this claim were properly granted.
 
 CONCLUSION
 
 78
 For the foregoing reasons, we vacate the grant of summary judgment on plaintiff's claim that W & A and UC & S violated the FDCPA by sending debt collection letters that purported to be, but were not in any meaningful way, "from" attorneys and remand for further proceedings, including discovery, on this claim. We affirm the grant of the motions to dismiss the two remaining claims.
 
 
 
 Notes:
 
 
 [1]
 The facts described below are taken from plaintiff's complaint and are supplemented by the information alleged in affidavits submitted by the defendant attorneys in support of their motions for summary judgment. The Court is aware that plaintiff has not yet had an opportunity to conduct discovery, and recognizes that discovery may reveal that the facts as alleged by defendants are untrue. This summary, therefore, is not intended to preclude any such showing by plaintiff
 
 
 [2]
 Plaintiff eventually settled the underlying suit and it is undisputed that he paid no attorneys' fees to UC & S because Lord & Taylor obtained new counsel after plaintiff initiated this lawsuit
 
 
 [3]
 W & A partner Ronald Abramson stated that he reviewed plaintiff's "file" after it was referred by Lord & Taylor before sending the initial letter. Mr. Abramson averred that the "file" contained plaintiff's name, social security number, current address and home and work phone numbers, the account number, the date the account was opened, the date of the last charge on the account, the date the account was charged off and the account balance, as well as "a synopsis of [Lord & Taylor's] recent customer service notes regarding their efforts to resolve Mr. Miller's account prior to forwarding the matter to our firm for collection. These notes included a reference to the fact that Mr. Miller had offered a reduced payment on his account and that Lord & Taylor refused to accept less than what was owed." The affidavit does not, however, state whether the file contained the payment history, if any, on the account or a complete record of Lord & Taylor's customer service notes
 
 
 [4]
 The affidavit of Ronald Canter describes the sending of the April 24, 2000 and May 29, 2000 letters, based on Canter's review of W & A's "file" and "a review of activity that had taken place on Mr. Miller's account since W & A mailed him an initial collection letter. This review included reference to several unsuccessful attempts to contact Mr. Miller by telephone to discuss the account." Canter further stated that when Miller failed to respond to the April 24, 2000 follow-up letter, "I authorized the printing and mailing of an offer to Mr. Miller to settle for a reduced amount in order to avoid litigation.... When Mr. Miller failed to respond to any communications from our office, [W & A] forwarded his account for litigation to the law firm of Upton, Cohen and Slamowitz on July 12, 2000." There is no evidence in the record that W & A requested or received any additional information from Lord & Taylor before forwarding the account to UC & S for litigation
 
 
 [5]
 With no apparent irony despite their successful efforts to resist discovery, after plaintiff informed the district court that W & A took in over 55,000 new collection accounts monthly, "going name, account, last payment date; name[,] account, last payment date, okay, beep, beep, beep, letter, letter, letter," defendants objected to the consideration of this information because it was "not in the record; it's not true."
 
 
 [6]
 Plaintiff also asserts that UC & S consistently seeks a 20% fee without ascertaining whether the fee is reasonable. The fee sought here, however, was only $323.63, and plaintiff does not allege that this fee is unreasonably high. As the district court observed, "I can't imagine anything that a lawyer does not generating at least 322[sic] dollars in fees. So I cannot say that that amount was excessive or unreasonable given what went on here, the sending of a few letters or, therefore, that Upton Cohen's alleged sharing of part of that fee, some 40 dollars, with the network that referred them to the client, was contrary to the express authorization of the agreement to also be liable for attorney's fees here."
 
 
 [7]
 We therefore do not reach defendant NAN's alternative arguments that it cannot be held liable under the FDCPA because it is not a debt collector within the meaning of the FDCPA nor do we reach the argument advanced by all defendants that the proposed fee sharing agreement between NAN and the affiliate law firms comports with New York professional ethics rules. We express no view on that issue