In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2739

WHITE PEARL INVERSIONES S.A. (URUGUAY) and
SANLO CORP.,

*Plaintiffs-Appellants*,

*v.*

CEMUSA, INCORPORATED,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 6365—**Wayne R. Andersen**, *Judge*.

ARGUED JUNE 7, 2011—DECIDED JULY 26, 2011

Before EASTERBROOK, *Chief Judge*, and BAUER and
WILLIAMS, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Shelters at bus stops and
trash baskets on municipal streets are no longer just
shelters and trash baskets. They have become "street
furniture." With the change of name comes an oppor-
tunity for advertising. Instead of paying someone to
build and maintain fixtures, cities invite specialized

enterprises to pay them. The vendors erect and maintain the street furniture at their own expense, financing the venture by advertising. Vendors give the cities a cut of that income. Whichever firm offers a city the most lucrative deal gets the contract—provided the city deems the bidder reputable and reliable.

Corporación Europea de Mobiliario Urbano, S.A., a Spanish firm, places street furniture within the European Union. Its subsidiary Cemusa, a Delaware corporation, wanted to break into the United States market. It hired White Pearl Inversiones as a consultant. White Pearl had helped Corporación Europea de Mobiliario Urbano enter the Brazilian market, and Cemusa hoped that it could do the same in the United States. White Pearl offered its aid on a handshake basis in Miami and San Antonio, where Cemusa bid and won. They decided to make their arrangement more formal and longer-lasting.

A contract between White Pearl and Cemusa, dated March 25, 2003, says that White Pearl will "[p]rovide advice and guidance on the strategy to be adopted by Cemusa, as it relates to the City of New York street furniture market". White Pearl also agreed to "introduce Cemusa as an important international company operating with the design, manufacture, installation, leasing and management of street furniture in major markets, and as a competent party to provide such services in the City of New York". This contract, which we call the Letter Agreement, provides that White Pearl would be paid $240,000 for these services over the next nine months. The Letter Agreement contemplates that White

Pearl and Cemusa would soon adopt a more general contract, the Master Agreement, and provides that, if they do, and Cemusa wins New York's business, the $240,000 "shall be deducted from any compensation owed by Cemusa to White Pearl pursuant to the Master Agreement or any other agreements arising therefrom."

Six days later they signed the Master Agreement. It provides that, for each city in which Cemusa and White Pearl join forces, they will negotiate a city-specific RFP Agreement. (In government-contract lingo, RFP means "request for proposals": a unit of government invites vendors to submit their prices and specifications for a described task.) If they don't have a RFP Agreement providing a different fee for a given city, White Pearl is to receive 3.75% of Cemusa's net advertising revenue realized after a successful bid. White Pearl's right to this fee becomes vested once a given city issues its RFP, but until then the Master Agreement is terminable at either side's option on 30 days' notice.

By early 2004 New York City still had not issued a RFP for street furniture. On February 17, 2004, Cemusa exercised its right to terminate the Master Agreement. White Pearl contends, and we must assume, that Cemusa's only reason was its belief that 3.75% is excessive. It would amount to more than $12 million, White Pearl believes, if Cemusa got the business for all five boroughs in New York City. Cemusa hoped to receive White Pearl's aid for less. The parties negotiated toward a substitute contract that would have paid White Pearl $2 million, but Cemusa never signed those papers.

At the end of March 2004 New York City solicited proposals for street furniture. Cemusa bid for the business in all five boroughs, and it won the contract in all five in July 2004. It has refused to compensate White Pearl beyond the $240,000 paid under the Letter Agreement. White Pearl filed this suit under the international diversity jurisdiction. 28 U.S.C. §1332(a)(3). The complaint alleges that White Pearl is incorporated in Uruguay and has its principal place of business in Rio de Janeiro, and that Cemusa is a Delaware corporation with its principal place of business in Chicago. (Sanlo Corp., a second plaintiff, is a Florida corporation with its principal place of business in Miami. It does not have any claim independent of White Pearl's, and its presence as a litigant is mysterious. We do not mention it again.)

There is a problem in White Pearl's jurisdictional allegations—a problem that we have seen too often. The complaint asserts that White Pearl is "a corporation"; the appellate briefs repeat this statement, which assumes that Uruguay has business entities that enjoy corporate status as the United States understands it. Yet not even the United Kingdom has a business form that is exactly equal to that of a corporation. For example, it can be difficult to decide whether a business bearing the suffix "Ltd." is a corporation for the purpose of §1332 or is more like a limited partnership, limited liability company, or business trust. See, e.g., *Lear Corp. v. Johnson Electric Holdings Ltd.*, 353 F.3d 580, 582–83 (7th Cir. 2003).

It can be hard to classify even firms under state law. Businesses organized as trusts don't have their own

citizenship; they take the citizenship of the trustee (or citizenships, if there are multiple trustees). *Navarro Savings Association v. Lee*, 446 U.S. 458 (1980). Limited partnerships, limited liability companies, and similar organizations also are disregarded for jurisdictional purposes. For an LP, LLC, or similar organization, the citizenship of every investor counts. See, e.g., *Carden v. Arkoma Associates*, 494 U.S. 185 (1990) (limited partnership); *Cosgrove v. Bartolotta*, 150 F.3d 729 (7th Cir. 1998) (limited liability company); *Guaranty National Title Co. v. J.E.G. Associates*, 101 F.3d 57 (7th Cir. 1996) (essential to trace the citizenship of investors through all levels, if, say, one LP invests in another). If even one investor in an LP or LLC has the same citizenship as any party on the other side of the litigation, complete diversity is missing and the suit must be dismissed. See, e.g., *Indiana Gas Co. v. Home Insurance Co.*, 141 F.3d 314, rehearing denied, 141 F.3d 320 (7th Cir. 1998) (ordering a suit against an insuring syndicate at Lloyd's of London dismissed for this reason). But cf. *Hoagland v. Sandberg, Phoenix & von Gontard, P.C.*, 385 F.3d 737 (7th Cir. 2004) (a "professional corporation" is a corporation even though it has many attributes of a partnership).

If it is hard to determine whether a business entity from a common-law nation is equivalent to a "corpora-tion," it can be even harder when the foreign nation follows the civil-law tradition. Uruguay has at least three forms of limited-liability businesses: sociedad anónima (S.A.), sociedad anónima financiera de inversión (S.A.F.I.), and sociedad responsabilidad limitada (S.R.L.). White Pearl did not say which kind it is, and its lawyers

did not analyze whether that kind of business organization should be treated as a corporation. We learned at oral argument that White Pearl's lawyers did not know—indeed, that they did not even know their client's legal name and had not tried to analyze the significance of its (unknown) organizational attributes. They simply assumed that Uruguay has such a beast as a "corporation" and that White Pearl is one. The lawyers for Cemusa made the same assumption.

A memorandum filed at our direction after oral argument reveals that White Pearl's name is "White Pearl Inversiones S.A. (Uruguay)". The complaint and appellate briefs had called it simply "White Pearl Inversiones"; the absence of any initials alerted the court to a potential problem. The post-argument memorandum, which Cemusa joins, contends that a sociedad anónima in Uruguay has the characteristics of a joint-stock company in a common-law jurisdiction and therefore is treated as a corporation under §1332. The memorandum cites *Twohy v. First National Bank of Chicago*, 758 F.2d 1185, 1194–95 (7th Cir. 1985), which says that a civil-law sociedad anónima is equivalent to a joint-stock company. The parties add that regulations treat a sociedad anónima as a corporation for income-tax purposes. 26 C.F.R. §301.7701–2. But here things get sticky, because, no matter what we may have thought in *Twohy*, and no matter what the tax regulations say, the Supreme Court had held that joint-stock companies are *not* corporations for purposes of the diversity jurisdiction. See *Chapman v. Barney*, 129 U.S. 677 (1889) (joint-stock company is treated as a partnership).

A sociedad anónima may be best understood as a corporation despite what we called it in *Twohy*. It has many important attributes of corporate-ness (on which see *Lear*, 353 F.3d at 583): it is a legal person with perpetual existence, governed indirectly by an elected board or administrator rather than by investors; it can issue tradeable shares, and investors are liable only for agreed capital contributions. Uruguay Commercial Companies Law (No. 16.060) of 1 November 1989. But we need not decide. If it is a joint-stock company, then the citizenship of its equity investors controls. The joint post-argument memorandum tells us that it has only two, Marcelo Conde and Jorge Luz, both of whom are citizens of Brazil. They reside in Rio de Janeiro, so §1332(a)'s hanging paragraph, which treats aliens admitted for permanent residence as if they were citizens of the states where they live, does not apply. Complete diversity has been established—though the lawyers took needless risk, and wasted a lot of the judges' time, by ignoring the proper treatment of foreign business entities until the case reached the court of appeals.

The district court dismissed White Pearl's complaint, observing that it had received the agreed compensation. 2010 U.S. Dist. LEXIS 72141 (N.D. Ill. July 16, 2010). The Letter Agreement says that Cemusa will pay $240,000 or any greater amount specified in a later contract. The only later contract is the Master Agreement—which does not entitle White Pearl to anything, because it was terminated before New York City issued its RFP for street furniture. White Pearl does not contend that Cemusa owes it anything under the Master Agreement;

it accepts the validity of the termination. (If White Pearl were claiming something under the Master Agreement, this suit would be the wrong forum: the Master Agreement contains a broad arbitration clause.) Nonetheless, White Pearl insists, it is entitled to more under the Letter Agreement.

White Pearl's lawyers have scoured the legal phrasebook. Their complaint asserts breach of contract, breach of a covenant of good faith and fair dealing, breach of a settlement agreement, promissory estoppel, equitable estoppel, quantum meruit, unjust enrichment, constructive trust, accounting, reformation of contract, and several flavors of fraud. The district court needlessly complicated things by dismissing the complaint under Fed. R. Civ. P. 12(b)(6). This has led to a debate in this court about whether the complaint contains enough to make out plausible claims under the new approach to pleading established by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). But this complaint is not too skimpy; instead it contains quite enough to show that White Pearl must lose. The rule that supports dismissal is Rule 12(c), judgment on the pleadings. Trees could have been saved by citing Rule 12(c) rather than Rule 12(b)(6).

The second question in a diversity suit is: What body of law supplies the rule of decision? (The first question, whether subject-matter jurisdiction exists, we have addressed already.) The Letter Agreement provides a straightforward answer to the choice-of-law question: "This agreement shall be governed by the laws of Spain."

So what does Spanish law have to say about White Pearl's claims for relief? The briefs are mum.

White Pearl is represented by the Chicago office of Wilson, Elser, Moskowitz, Edelman & Dicker; Cemusa is represented by the Miami office of Hunton & Williams plus the Chicago office of K&L Gates. All three are substantial law firms with expertise in business law and international trade—as one would expect when a Uruguayan firm based in Rio de Janeiro sues the U.S. component of a multinational enterprise based in Madrid. Spanish law should not pose a challenge to these firms. Instead of addressing that subject, however, they ignored it. White Pearl's brief cites Illinois and New York cases indistinguishably and does not explain why we should disregard Spanish law—and why, if we do, we should prefer Illinois law over New York law, or the reverse. Cemusa's brief is equally indifferent to choice of law. It is hard to know whether to treat the subject as forfeited and dismiss the appeal, or use Illinois law on the ground that the district court sits there. We shall do the latter, because like the district court we think the outcome straightforward, without foreclosing the possibility of dismissal when the problem is more complex and the parties leave the court adrift.

This case is governed by the principle that courts do not invoke doctrines such as quantum meruit or unjust enrichment to change the price term in a contract. White Pearl tells us that it spent about $440,000 to assist Cemusa. So what? No rule of law entitles every business to a profit on every deal. White Pearl agreed to a fixed

price; it did not negotiate a cost-plus contract, or one that paid by the hour that its consultants devoted to the project.

We doubt that all of the work White Pearl says it performed is covered by the Letter Agreement. A substantial fraction of its effort was devoted to persuading Corporación Europea de Mobiliario Urbano to allow its subsidiary to bid on the New York project. That's not what White Pearl was hired to do—at least, it is not what the Letter Agreement engages White Pearl to do. If White Pearl performed tasks outside the contract, it has no legal right to payment. So we held in *Indiana Lumbermens Mutual Insurance Co. v. Reinsurance Results, Inc.*, 513 F.3d 652 (7th Cir. 2008). Although that case was decided under Indiana law, the rule in Illinois is the same. See *Hayes Mechanical, Inc. v. First Industrial, L.P.*, 351 Ill. App. 3d 1, 9, 812 N.E.2d 419, 426 (2004); *Industrial Lift Truck Service Corp. v. Mitsubishi International Corp.*, 104 Ill. App. 3d 357, 360–61, 432 N.E.2d 999, 1003 (1982). White Pearl did much of its intra-corporate-family lobbying after Cemusa had terminated the Master Agreement. Doubtless it hoped that Cemusa would be grateful and reward it—but for the reasons we gave in *Indiana Lumbermens* a business that volunteers services must rely for compensation on the reputational interest of its trading partner.

If Cemusa did not treat White Pearl well, it will pay a penalty in the market; other consultants (and for that matter professionals such as law firms, accountants, and advertising agencies) will demand a premium price to deal with a business known to take advantage of

others. Still, a firm is not legally obliged to recompense another for volunteered work, let alone to ensure that its trading partners don't lose money. Businesses themselves know best how to protect their interests. When courts award sums on top of a contractual price, this reduces entrepreneurs' ability to allocate risks through written agreements. Destabilizing or devaluating the institution of contract would raise the transactions costs of business, injuring economic productivity and growth. As Learned Hand remarked, it is better for courts to let some seemingly unjust outcomes alone than to intervene in a way that makes contracts less reliable. See, e.g., *Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 258 (7th Cir. 1998), quoting from *James Baird Co. v. Gimbel Bros., Inc.*, 64 F.2d 344, 346 (2d Cir. 1933) ("in commercial transactions it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves").

White Pearl insists that it is entitled to at least the $2 million that the parties discussed during settlement negotiations, even if it does not get 3.75% of the net advertising revenue. But Cemusa never signed a promise to pay White Pearl $2 million, and unsuccessful settlement negotiations are inadmissible in federal litigation. Fed. R. Evid. 408(a). The negotiations therefore cannot be used as a benchmark for an award under the rubric of quantum meruit or unjust enrichment. White Pearl has not tried to explain how its argument could be reconciled with Rule 408(a).

The most that one can say for White Pearl's position is that Illinois provides a remedy under the quantum

meruit rubric when a business terminates a contract after most of the work has been done. For example, a client may fire his lawyer at any time, for any reason. Suppose a lawyer has invested substantial time under a contingent-fee contract that entitles counsel to 40% of any amount awarded by a jury. If the client fires his lawyer moments before the judge opens the envelope containing the jury's verdict, the lawyer does not go home empty-handed but receives compensation appropriate in light of the work done and the results obtained. See *Wegner v. Arnold*, 305 Ill. App. 3d 689, 693–94, 713 N.E.2d 247, 250 (1999), citing *Fracasse v. Brent*, 6 Cal. 3d 784, 494 P.2d 9 (1972). Similarly, a real estate agent who finds a buyer for the client's mansion, and is fired on the eve of closing, receives a full fee even though buyer and seller tried to cut out the middleman and appropriate to themselves the amount that the agent would have received as a commission. See *Kenilworth Realty Co. v. Sandquist*, 56 Ill. App. 3d 78, 371 N.E.2d 936 (1977). Illinois uses a similar rule for salesmen who are fired after negotiating a deal but before the commission is payable (usually at the end of a quarter or year, when total sales are known). See *Penzell v. Taylor*, 219 Ill. App. 3d 680, 579 N.E.2d 956 (1991). White Pearl contends that it is entitled to more money because Cemusa likewise has taken advantage of the fact that White Pearl performed first and thus was exposed to opportunistic termination.

This analogy is not a good one, however. White Pearl is not in the position of a real estate agent fired after locating a buyer ready, willing, and able to pay, or a travelling salesman fired after making a sale but before

the date commissions are distributed. When White Pearl was "fired" (by termination of the Master Agreement), New York City had yet to issue its RFP for street furniture. White Pearl did not spend March through June of 2004 lobbying New York on behalf of Cemusa; its consultants were in Madrid lobbying Cemusa's superiors. What White Pearl did, translated to the world of real estate sales, is more like visiting a property, taking pictures, writing a good description, and giving the client valuable advice about what price to ask and what strategy to adopt. If such an agent is fired before the house goes on the market (equivalent to ending the Master Agreement before New York City called for bids), the agent gets only the agreed fee for preparatory services, or recompense for out-of-pocket expenses. Similarly a contingent-fee lawyer who advises a client whether to file suit, and what theories to use, is not entitled to a fee if the client eventually hires someone else, who achieves a smashing victory. See *Rhoades v. Norfolk & Western Ry.*, 78 Ill. 2d 217, 399 N.E.2d 699 (1979).

Cemusa agreed to pay White Pearl $240,000 for preparatory services—defined in the Letter Agreement and the Master Agreement as consulting and PR work done before New York City issued a RFP for street furniture. Cemusa kept that promise. It terminated the Master Agreement before New York issued the RFP. White Pearl, like the real estate agent fired before a house is listed for sale, is not entitled to more.

AFFIRMED