**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

### For the Seventh Circuit
### Chicago, Illinois 60604

Argued February 14, 2012
Decided April 25, 2013

**Before**

FRANK H. EASTERBROOK, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

EDMOND E. CHANG, *District Judge**

No. 11-3060

| | |
|---|---|
| GLOBAL DAIRY SOLUTIONS PTY LTD, | Appeal from the United States |
|    *Plaintiff-Appellant,* | District Court for the Western |
| | District of Wisconsin. |
|   *v.* | |
| | No. 10-cv-00237 |
| BOUMATIC LLC, | |
|   *Defendant-Appellee.* | Stephen L. Crocker, |
| |  *Magistrate Judge.* |

**ORDER**

  BouMatic LLC makes commercial dairy-processing equipment that is used to milk cows. In June 2008, BouMatic entered into two distributorship agreements with Global Dairy

---

  * The Honorable Edmond E. Chang, District Judge of the United States District Court for the Northern District of Illinois, sitting by designation.

Solutions, an Australian corporation.[1] In the two agreements, Global Dairy agreed to distribute BouMatic equipment in Australia and New Zealand. One agreement covered Australia; the other, New Zealand. (The two agreements are identically worded, so from now on, we refer only to a single Agreement for the sake of convenience.)

In late November 2009, BouMatic terminated the Agreement, prompting Global Dairy to sue for breach of contract. The district court granted summary judgment in BouMatic's favor, holding that BouMatic had "good cause" under the Agreement to terminate. We review that grant of summary judgment *de novo*. *Blue v. Hartford Life & Accident Ins. Co.*, 698 F.3d 587, 595 (7th Cir. 2012). Like the district court, we must view all of the facts in the light most favorable to the non-movant, Global Dairy, and also draw all reasonable inferences in Global Dairy's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

When the evidence is viewed in Global Dairy's favor, the relationship between the parties did not start out as sour as it ended. Indeed, it was BouMatic that encouraged Global Dairy's formation in order to address two problems: BouMatic was dissatisfied with its Australian distributor, a company named Daviesway, and BouMatic did not even have a distributor in New Zealand. So BouMatic encouraged one of its own Australian-based employees, Christopher Nisbet, to create a new BouMatic distributor for the region. Nisbet, along with two other men, did so, thus forming Global Dairy. But Daviesway stayed on as a BouMatic distributor in Australia.

And the relationship did sour. In March 2009, the BouMatic regional sales manager who had negotiated the Agreement, Jorge Prieto, was replaced by John Paetz. This spelled trouble for Global Dairy because Paetz had known John Davies, the owner of Daviesway, for around a decade. One month after Paetz took over the region at BouMatic, Paetz wrote an internal BouMatic email complaining about the Agreement's requirement that there be "good cause" to terminate Global Dairy. In June 2009, Paetz visited Global Dairy and flat-out said that Global Dairy should not have been named a BouMatic distributor in Australia, and instead Global Dairy should focus on distribution efforts in New Zealand.

---

[1]Subject matter jurisdiction applies in this diversity action. Global Dairy's Australian corporate form is akin to a corporation in the United States, and thus Global Dairy is an Australian citizen. *See White Pearl Invesiones S.A. (Uruguay) v. Cemusa, Inc.*, 647 F.3d 684 (7th Cir. 2011) (when determining a foreign company's citizenship for diversity jurisdiction purposes, citizenship is determined based on which American business form the foreign company most closely resembles). BouMatic is a limited liability company, none of whose members are citizens of Australia.

Late October 2009 marked the beginning of the end. On October 27, Daviesway complained to BouMatic that Global Dairy's pricing was undercutting Daviesway's business, and Daviesway threatened to disassociate from BouMatic if Global Dairy's distributorship was not terminated. A few days later, on October 30, BouMatic "Dairy Solutions Manager" Chris Berning, who had sales manager responsibilities, exchanged emails with Steve Brown, BouMatic's Vice President of Sales and Marketing. In the e-mail, Berning stated, "I need to find a way to terminate GDS [Global Dairy]. They have started paying again and I am not sure of next steps. Was your fall back with GDS the payment issue? If so is there anything else to get them on. If we have some specific, albeit weak ones, I do not mind supporting the decision."

A few weeks later, things came to a head. On November 24, John Davies sent an email to Berning (with a copy to John Paetz), again complaining about Global Dairy's prices and about the very fact that there were two BouMatic distributors in Australia. Davies declared, "If BouMatic is going to let this situation continue then there is little point in Daviesway remaining a distributor." Davies wanted to know, within seven days, "what action BouMatic intend[ed] to take to rectify this debacle of dual distribution."

It did not take seven days. The next day, November 25, BouMatic emailed a three-sentence letter to Global Dairy, stating without explanation that Global Dairy "has materially failed to comply" with the Agreement and that the Agreement was terminated effective immediately. In a letter sent to BouMatic the next day, Global Dairy's Australian lawyer pointed out that the Agreement required a termination process that included written notice of the breaches and an opportunity to cure.

On December 3, BouMatic's attorney sent Global Dairy another notice of termination, and this time the letter cited to specific provisions of the Agreement allegedly breached by Global Dairy. The letter prefaced its list of alleged material breaches with the introduction, "Specifically, GDS [Global Dairy] is in material breach of the following provisions in the Distributorship Agreement," and then the list described and cited seven provisions: selling competitors' products; failing to vigorously and continuously promote the sale of BouMatic's products; failing to represent that a part was originally made or supplied by BouMatic only if it was so made or supplied; failing to affirmatively tell customers that parts or equipment not supplied by BouMatic are not covered by BouMatic's warranty; failing to keep current on its account with BouMatic; accepting or continuing a sales relationship involving competitors' products and then failing to adequately promote BouMatic products and services; and failing to service BouMatic products in a timely, efficient, and commercially reasonable manner.

What the letter did *not* say was that Global Dairy had breached the Agreement by failing to meet "sales forecasts." This brings us to the appeal: BouMatic won summary judgment by arguing that the evidence establishes that Global Dairy failed to meet sales forecasts, and the

failure constituted "good cause" to terminate the Agreement. Remember that, aside from one irrelevant exception, BouMatic needed "good cause" to terminate the Agreement. The Agreement defined "good cause" in both general and specific terms. As a general matter, good cause meant Global Dairy's "failure to comply substantially with essential and reasonable requirements imposed upon [Global Dairy] by BouMatic, or [Global Dairy's] material breach of this Agreement, which breach cannot be cured or remains uncured for 30 days after written notice to [Global Diary] by BouMatic." Agreement ¶ 14. More specifically, good cause "shall expressly include, but not be limited to, a failure to achieve a minimum of 35% of *sales forecast* by the end of six months of a sales period, or 70% of the *sales forecast* by the end of a twelve month sales period." *Id.* (emphases added).

The "sales forecast" to which the good-cause definition refers must mean the "forecast" described in Paragraph 12(d) and (e) of the Agreement (there is no other paragraph that describes "sales forecast"):[2]

> **Distributor General Obligations.** Distributor shall . . . .:
>
> d.　　　Participate in the forecasting process when and as requested by BouMatic who will determine a final forecast for Distributor on at least an annual basis. Distributor shall agree with BouMatic's reasonable forecast. This forecast will be used to evaluate Distributor's performance.
>
> e.　　　Meet or exceed the mutually agreed forecast.

Agreement ¶ 12(d), (e).

Global Dairy contends that no sales forecast was ever set by BouMatic, while BouMatic argues that the back-and-forth leading up to the Agreement constituted the governing sales forecast. For BouMatic, the participants in the back-and-forth were Mike Pawlak, BouMatic's Executive Vice President of Sales and Marketing, and Jorge Prieto, the company's Director of Sales for, among other regions, the area covering Australia and New Zealand. For Global Dairy, two of its co-founders, Chris Nisbet and Tim Larsen, took part in the discussions.

During the negotiations leading up to the Agreement, on June 3, 2008, Prieto emailed Tim Larsen to seek "input/confirmation that you agree/disagree" with the "figures" provided

---

[2]The other mention of "sales forecast" is in Paragraph 3 of the Agreement, which explains what it means to have an "Assigned Territory": "BouMatic assigns territories primarily to measure market penetration, evaluate distributor performance, and make sales forecasts. . . . BouMatic reserves the right, in its sole discretion, to modify your Assigned Territory."

on an attached spreadsheet, the purpose of which was "for all of us to have a clear understanding on where we stand concerning the distribution agreement process." The next day, Larsen sent Prieto an email bearing the subject-line, "GDS BUDGET 2008-2010." The email stated, "Find figures for NZ and Australia for BouMatic. We have revised the sales based on our current knowledge such as sales in Aust/NZ for Larsen Engineering (existing) and success we have had with Systems etc to date. I believe these figures are achievable in the market place with the correct setup and support." The attachment was a spreadsheet entitled, "2008-2010 Projections," and the spreadsheet reflected dollar figures for projected BouMatic sales in Australia and New Zealand. Around three weeks later, on June 30, the parties entered into the Agreement.

In support of BouMatic's summary-judgment motion, Prieto submitted an under-oath declaration stating that those sales projections were the Agreement's "sales forecasts" for good-cause termination purposes (there is no dispute that Global Dairy fell well short of the sales-projections numbers). In interpreting the contract, the parties agree that Wisconsin law applies (they agreed to that in the Agreement and in the litigation below). The Wisconsin Supreme Court tells us that "[t]he primary goal in interpreting a contract is to determine and give effect to the parties' intention. When the language of a contract is unambiguous, we apply its literal meaning. However, if contractual language may reasonably be construed to have more than one meaning, the contract is ambiguous." *Wisconsin Label Corp. v. Northbrook Property & Casualty Ins.*, 607 N.W.2d 276, 283 (Wis. 2000). If a contract is ambiguous, then the contract's interpretation presents a question of fact for the jury to resolve. *Town Bank v. City Real Estate Dev., LLC*, 793 N.W.2d 476, 483 (Wis. 2010).

Although BouMatic contends that Prieto actually did set a "sales forecast" under the Agreement by using the pre-Agreement sales projections provided by Larsen, we conclude that a reasonable jury could find otherwise. There is enough circumstantial evidence—when viewed in the light most favorable to Global Dairy and drawing all inferences for Global Dairy—to undermine Prieto's declaration. Start with the fact that, viewing the evidence in Global Dairy's favor, Prieto never referred to the sales projections as the Agreement's governing sales forecasts—at least, not until he signed the declaration in support of the summary-judgment motion. Similarly, Nisbet (the Global Dairy co-founder) and Pawlak (BouMatic's then-executive vice president for sales) both testified that they too never discussed the "sales projections" (or anything else for that matter) as being the "sales forecasts" under the Agreement or being the basis for termination of the Agreement.

BouMatic counters that the Agreement does not specifically require that BouMatic inform Global Dairy of the sales forecasts, so it is irrelevant, says BouMatic, that Prieto never explicitly told Global Dairy that the pre-Agreement sales projections would be the sales forecasts for 2008, 2009, and 2010. Setting aside how Global Dairy could be in a position to

"agree" to reasonable forecasts if not informed of them, as required by the Agreement, BouMatic is demanding too much of the relevancy standard and granting too little to the summary-judgment lens. A reasonable inference—not the only inference, but a reasonable one—from Prieto's never-expressed linking of the pre-Agreement sales projections to the Agreement's governing sales forecasts is that Prieto did not in fact set the forecasts with the projections, and thus did not set forecasts at all.

This is especially true when we consider how far Prieto deviated from BouMatic's usual process for setting governing sales forecasts for distributors. Prieto testified that BouMatic used an annual sales forecasting process for its distributors: in November or December of each year, BouMatic's regional and district sales managers reviewed, with their distributors, the sales numbers for the previous year and created a sales forecast for the upcoming year. These forecasts were sent to Prieto, who in turn forwarded them to BouMatic's financial department, thus recording the forecasts as the goals for the distributors for the next year. Prieto did not do any of this with Global Dairy. Prieto contends that there was no need because the pre-Agreement sales projections constituted the governing sales forecasts, and a jury could believe that. But once again that contention does not sap all relevancy out of the fact that BouMatic deviated from the annual forecast-setting procedure: when viewed in Global Dairy's favor, a jury could reasonably infer that Prieto did not use the sales projections.

Most telling of all is the lack of any mention of an alleged sales-forecast shortfall in BouMatic's December 3, 2009 termination letter. Silence can be probative. *See Johnson v. Acevedo*, 572 F.3d 398, 401 (7th Cir. 2009) (citing *Silver Blaze*, THE MEMOIRS OF SHERLOCK HOLMES, to explain that an omission can "convey[] a powerful message"). It depends on the circumstances. Here, Global Dairy's lawyers had demanded that BouMatic explain the termination, claimed that the termination would cause Global Dairy significant damages, and threatened to sue BouMatic. The December 3 letter was BouMatic's attempt to head-off the lawsuit. Yet there was no mention of a sales-forecast shortfall. Indeed, the letter detailed seven reasons for the termination, citing specific paragraphs and sub-paragraphs of the Agreement which Global Dairy assertedly had breached, including Paragraphs 12(a), (b), (c), (f), (h), and (i). The sales-forecast provisions are Paragraphs 12(d) and (e), so Global Dairy can argue to a jury that BouMatic did not simply overlook those provisions when stating its reasons for termination; instead, BouMatic did not have a sales-forecast shortfall on which to rely. Viewing that silence in Global Dairy's favor, a reasonable jury could find that a shortfall was not an actual ground for terminating the Agreement, and that BouMatic had not set a governing sales forecast under the Agreement.

To counter the probativeness of the silence, BouMatic says there was no duty under the Agreement to notify Global Dairy of a sales-forecast shortfall because the Agreement only required written notice of "material breaches" but did not require notice of good-cause based

on a shortfall. But the mere fact that there was no *duty* to notify Global Dairy of that basis for termination does not render *irrelevant* that BouMatic, trying to stave off a lawsuit, did not mention it. If the shortfall was in fact a basis for termination, what reason would there be not to mention it? Global Dairy can ask a jury to conclude that the silence means there in fact was no shortfall because no governing sales forecast was set.

BouMatic's position on appeal has a consistent theme, one expressed at times by the district court, App. 125-26, that "[t]here is no evidence in the record which shows that Mr. Prieto's testimony is so *impossible* to reconcile that jury must decide his credibility," BouMatic Br. at 21. The origin of this argument seems to be language drawn from our opinion in *Boyd v. Wexler*, 275 F.3d 642, 646 (7th Cir. 2001). In that case, a lawyer was accused of sending debt-collection letters without reviewing them, a practice which would violate the Fair Debt Collection Practices Act. *Id.* at 644. In the district court there, the lawyer won summary judgment based on an affidavit in which he averred that every collection letter sent out by his law firm was reviewed by a lawyer. But the 3-lawyer firm sent out an average of around 51,000 letters per month, yet a firm of that size could be expected—if each letter really were being reviewed—to send at most 1,000 letters per month. *Id.* at 645. So even though there was no testimony *directly* refuting the affidavit, we reversed because "[c]ircumstantial evidence can create an issue of credibility." *Id.* From the circumstantial evidence, "a reasonable jury could infer that the letters to the plaintiffs were not in fact reviewed by" a lawyer. *Id.* It is true that we *described* the volume of mail as making the lawyer's affidavit "incredible, or at least highly implausible." *Id.* at 646. But that description did not elevate the summary-judgment standard into one that requires the non-movant to show that the movant's evidence is "impossible" to reconcile with other evidence, BouMatic Br. at 21, or to show that the movant's evidence has been "directly and overwhelmingly impeached," App. 125. "[C]ertainty of winning at trial is obviously not a precondition to getting a trial." *Boyd*, 275 F.3d at 647; *see also Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .") On the properly-applied standard, when viewing the evidence in the light most favorable to Global Dairy and drawing reasonable inferences in its favor, a reasonable jury could find that BouMatic did not set sales forecasts under the Agreement, and thus Global Dairy's sales performance did not constitute good cause to terminate the Agreement.

The reversal of summary judgment on the breach of contract claim also requires vacatur of the remaining aspects of the judgment. The district court granted summary judgment on Global Dairy's good faith and fair dealing claim on the same premise as the summary-judgment grant on the breach of contract claim, that is, BouMatic simply exercised its right to terminate under the Agreement. So this claim too is reinstated. We note, however, that the district court discussed the possibility that Global Dairy raised the claim too late in the litigation; the district court ultimately decided not to definitively decide the timeliness of the

claim. On remand, the district court is free to decide, in the first instance, whether Global Dairy raised the claim too late.

The district court also granted summary judgment in favor of BouMatic's unpaid-invoices counterclaim in the amount of $87,928.03. But if Global Dairy wins on the breach of contract claim, then Global Dairy may assert (as it did below) set off or recoupment against the invoices award. So the unpaid-invoices judgment must be vacated because the breach of contract claim is reinstated. On remand, however, the district court may enter partial summary judgment for BouMatic as to *liability* on the unpaid invoices identified by the district court. It is the damages amount that must await the resolution of the breach of contract claim.

Lastly, we vacate the award of attorneys' fees and costs to BouMatic. The award was largely premised on BouMatic's summary-judgment victory on the breach of contract claim, which has been reversed.

For the foregoing reasons, the judgment is reversed as to the breach of contract claim, and is vacated as to the good faith and fair dealing claim, the unpaid-invoices counterclaim, and the award of attorneys' fees and costs. We note that, although we have been speaking as if the trier of fact will be a jury, Global Dairy did waive its right to a jury trial in the Agreement. BouMatic has demanded a jury trial, however, so whether the trier of fact is a jury or the assigned judge depends on whether BouMatic sticks to that choice.